[No. C064947. Third Dist. Apr. 27, 2011.]

JIM PRICE, Plaintiff and Respondent, v.
OPERATING ENGINEERS LOCAL UNION NO. 3 et al., Defendants and
Appellants.

**COUNSEL**

Nevin & Absalom, Kenneth C. Absalom and James J. Achermann for Defendants and Appellants.

Downey Brand, William R. Warne, Cassandra M. Ferrannini and Monica S. Hans for Plaintiff and Respondent.

**OPINION**

**DUARTE, J.**—Defendants Operating Engineers Local Union No. 3, Greg Dornback, Henry Miles, Justin Diston, Mike Croll, Dan Kern, Mark Matney, Jeremiah Figueroa, Robert Shane Walthers and Bob Miller (collectively "the Union")[1] appeal from an order denying their special motion to strike the defamation and false light causes of action in the complaint filed by plaintiff, Jim Price. The Union brought its motion under Code of Civil Procedure section 425.16,[2] also known as the antistrategic lawsuits against public participation (anti-SLAPP) statute.

Price's defamation and false light claims are based on flyers containing disparaging statements regarding Price that the Union distributed at the apartment complex where Price lived. To prevail on its motion to strike, the Union must show that the flyers concern a matter of public interest within the meaning of section 425.16. The Union contends, among other things, that because the flyers were distributed during a labor dispute, it has shown that their distribution was a matter of public interest. We disagree.

As we will explain, the Union has not shown that its disparaging statements regarding Price involve an issue of public, as opposed to private, interest. Accordingly, we agree with the trial court that the Union failed to meet its threshold burden under the anti-SLAPP statute. Thus the burden never shifted to Price to show a probability of prevailing on the merits. We shall affirm.

---

[1] Justin Diston is the district representative for Operating Engineers Local Union No. 3's Sacramento district. Bob Miller is a "Special Representative to the Business Manager" and an employee of the union. Dan Kern and Henry Miles are union business agents. Mark Matney, Jeremiah Figueroa and Robert Shane Walthers are members of the union and employed by Road Machinery, LLC (Road Machinery). Greg Dornback and Mike Croll are members of the union.

[2] Further unspecified section references are to the Code of Civil Procedure.

## FACTS[3] AND PROCEDURAL HISTORY

Road Machinery supplies, repairs and rebuilds machinery for the mining, construction, industrial and governmental markets. Road Machinery's West Sacramento facility employed parts and service technicians who were union members. In 2008, Road Machinery began negotiating new collective bargaining agreements for union members who worked at the Fresno, San Leandro and West Sacramento facilities. The parties agreed on a single collective bargaining agreement covering the three facilities, but in September 2009, the parties reached an impasse.

Price began working for Road Machinery at the West Sacramento facility as vice-president and general manager, California division, on October 28, 2008. Price was not part of Road Machinery's collective bargaining committee; he had neither a role in nor the ability to affect Road Machinery's negotiations with the union.

On September 16, 2009, union members who worked at Road Machinery's West Sacramento facility, including several named defendants, went on strike. That same day, defendant Greg Dornback followed Price from Road Machinery's West Sacramento facility to Price's residence at the Cobble Oaks apartment complex in Rancho Cordova (Cobble Oaks). Others followed Price to Cobble Oaks on other occasions.[4]

On November 11, 2009, the Union placed copies of a flyer containing the following statements[5] on the doors and cars of Price's neighbors: "**NEIGHBORS, BEWARE OF THIS MAN: JIM PRICE**"; "[p]rotect your family, safeguard your property"; "there is no telling what he might do"; and "[c]omplain to Cobble Oaks about the sort of person they've let in your community." The flyer listed Price's business cell phone number and his apartment number, and encouraged Price's neighbors to complain to him directly.

Price's wife saw the flyers taped to her apartment door and posted throughout Cobble Oaks. The maintenance person at Cobble Oaks reported to

---

[3] The facts are drawn from the declarations filed in support and opposition of the Union's anti-SLAPP motion. The record discloses no evidentiary objections to the declarations.

[4] The record reflects a variety of other intimidation tactics and techniques alleged to have been employed by the Union that made Price fearful for his safety and the safety of others; because only the rulings regarding the defamation and false light claims are challenged in this appeal, only the facts relevant to those claims will be detailed herein.

[5] The content of the flyers is drawn from the declarations of Price and his wife, as copies of the flyers were not submitted as part of the record on appeal. Nowhere does it appear in the record or briefing that the Union disputes Price's characterization of the statements contained in the flyers.

her that defendant Dan Kern left a card with him and said, "Tell [Mrs. Price], I will be back," causing Price to be fearful for his wife's safety. Price reported this incident to police, but received no response. Copies of this same flyer were again distributed in mid-December 2009, to residents and guests entering and exiting Cobble Oaks.

In late November 2009, a second flyer was distributed. As Price was exiting Cobble Oaks, eight to 10 individuals, including some of the named defendants, shouted "vulgar and crude comments" to him and a flyer was thrust at him. Price saw these same individuals stopping cars entering and leaving Cobble Oaks to distribute flyers. This second flyer contained the following statements: "COBBLE OAKS RESIDENT JIM PRICE" "tried to take away workers' pension benefits"; "threatened workers with arrest for publicizing their fight for workplace justice"; and "threatened to use armed guards against the workers to shut down their strike." This flyer also listed Price's business cell phone number and apartment number.

The flyers' distribution by the Union at Cobble Oaks caused Price and his wife embarrassment and fear. Price's neighbors complained to the Cobble Oaks management about the flyers and their distribution. The apartment manager at Cobble Oaks told Price that the "disturbances" needed to stop. Price complained to police on a number of occasions about the Union's activities at Cobble Oaks, but was told that police could not act without court order. The record is devoid of any evidence establishing (or even alleging) the truth of the statements in either of the flyers. Price maintains that the statements were false.

On January 19, 2010, Price filed a complaint against the Union. The complaint alleged causes of action for (1) violation of Civil Code sections 51.7 and 52.1, (2) defamation, (3) intentional infliction of emotional distress, (4) invasion of privacy (false light), (5) invasion of privacy (intrusion into seclusion), and (6) stalking. The Union moved to strike the entire complaint under the anti-SLAPP statute and sought an award of fees and costs pursuant to the anti-SLAPP statute. Price opposed the anti-SLAPP motion.

The Union ceased all strike-related activities against Road Machinery the week of March 8, 2010. Union members ratified a new collective bargaining agreement on March 20, 2010.

On April 12, 2010, the trial court entered an order denying the Union's motion in its entirety. Finding that the Union had failed to meet its threshold burden of establishing that the challenged causes of action arose from acts in furtherance of the Union's right of petition or free speech within the meaning of the anti-SLAPP statute, the trial court did not consider whether Price established a probability of prevailing on his claims.

The Union filed a notice of appeal on April 22, 2010, and an amended notice of appeal on April 27, 2010. Its appeal is limited to the order denying its motion to strike counts 2 and 4—the defamation and false light causes of action.

The Union contends the trial court erred in denying its motion to strike by (1) failing to review each claim individually, (2) concluding that it did not meet its burden of establishing that Price's defamation and false light claims are based on conduct protected under the anti-SLAPP statute, (3) not applying a "mixed action" analysis, and (4) failing to address the issue of whether Price demonstrated a probability of prevailing on his defamation and false light claims.

## DISCUSSION

### The Anti-SLAPP Statute

A. *The Law*

█ The Legislature enacted the anti-SLAPP statute in response to the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Section 425.16 establishes a procedure whereby the court evaluates the merits of a lawsuit using a summary-judgment-like procedure at an early stage of the litigation (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278 [46 Cal.Rptr.3d 638, 139 P.3d 30]) in order to expeditiously eliminate nonmeritorious lawsuits that chill the exercise of free speech or petition rights in connection with a public issue. (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 734 [87 Cal.Rptr.3d 347].)

█ Under the anti-SLAPP procedure, a cause of action arising from an *act* by the named defendant *in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue* is subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that plaintiff will prevail on the claim. (§ 425.16, subds. (a), (b)(1).) The statute defines the italicized text above as (1) any written or oral statement or writing made before a legislative, executive or judicial proceeding or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of

public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e).)

 The anti-SLAPP statute requires the court to engage in a two-step process when deciding the special motion to strike. (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 477 [87 Cal.Rptr.3d 275, 198 P.3d 66].) First, the court must determine whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity within the meaning of the anti-SLAPP statute. (*Ibid.*) If the court finds that the defendant has made such a showing, it must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Ibid.*)

To meet its threshold burden, a defendant "need not *establish* that [its] action is constitutionally protected; rather, [it] must make a prima facie showing that plaintiff's claim arises from an act taken to further defendant's rights of petition or free speech in connection with a public issue."[6] (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 112 [1 Cal.Rptr.3d 501] (*Du Charme*).)

An order denying an anti-SLAPP motion is an appealable order, subject to de novo review. (§§ 425.16, subd. (i), 904.1, subd. (a)(13); *Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 961 [106 Cal.Rptr.3d 290].) We are not bound by the trial court's analysis and will affirm the trial court's decision if it is correct on any theory applicable to the case. (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573 [104 Cal.Rptr.3d 628].)

## B. Right of Petition or Free Speech

 We begin by determining whether Price's defamation and false light claims arise from acts "in furtherance of [the Union's] right of petition or free speech." (§ 425.16, subd. (b)(1).) Defamation "involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782.) False light is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed. (Rest.2d Torts, § 652E.)

---

[6] We do not, therefore, address in detail the Union's contention that "handbilling," or passing out flyers, is a constitutionally protected activity.

■ We agree with the Union that Price's defamation and false light claims are based on the *content of the flyers* that the Union distributed at the Cobble Oaks apartment complex in November and December 2009.[7] As such, Price's claims arise from acts in furtherance of the Union's right of free speech. Citing *Flatley v. Mauro* (2006) 39 Cal.4th 299 [46 Cal.Rptr.3d 606, 139 P.3d 2] (*Flatley*), Price contends that the Union's statements within the flyers are not covered under section 425.16 because defamatory speech is illegal. In *Flatley*, our Supreme Court held that "where a defendant brings a motion to strike under section 425.16 . . . but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was *illegal as a matter of law*, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action." (*Flatley, supra,* 39 Cal.4th at p. 320, italics added.)

The term "illegal" in *Flatley* means criminal, not merely violative of a statute. (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1654 [107 Cal.Rptr.3d 294].) This is because "a reading of *Flatley* to push any statutory violation outside the reach of the anti-SLAPP statute would greatly weaken the constitutional interests which the statute is designed to protect . . . [and a] plaintiff's complaint *always* alleges a defendant engaged in illegal conduct in that it violated some common law standard of conduct or statutory prohibition . . . ." (*Ibid.*) Here, the Union's speech is not alleged to be criminal. *Flatley* does not affect our analysis.

## C. *"Public Issue" or "Issue of Public Interest"*

We turn next to the question of whether the Union demonstrated that the statements in the flyers at issue were made in connection with a "public issue" or an "issue of public interest." We conclude that it did not.

■ The Union contends that its distribution of the flyers constitutes protected activity within the meaning of section 425.16, subdivision (e)(3) and (4). This section requires the speech at issue to occur in connection with a "public issue" or an "issue of public interest." (§ 425.16, subd. (e)(3) & (4); *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 [2 Cal.Rptr.3d 385] (*Weinberg*).)

The statute does not define the terms "public issue" or "issue of public interest." However, we have held that there must be "some attributes of the issue which make it one of public, rather than merely private, interest. A few

---

[7] Because we find that the flyers are the basis of Price's defamation and false light claims, we need not address the Union's "mixed action" analysis and Price's contention that the Union has forfeited this argument. Nor do we need to address the Union's claim that the trial court erred in failing to "individually analyze" each claim.

guiding principles may be derived from decisional authorities. First, 'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] Finally, 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' [Citation.] A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. [Citations.]" (*Weinberg, supra*, 110 Cal.App.4th at pp. 1132–1133.)

■ In *Du Charme, supra*, 110 Cal.App.4th 107, a former assistant business manager for the International Brotherhood of Electrical Workers, Local 45, sued Local 45 for defamation based on the allegedly false statement posted on Local 45's Web site that the plaintiff had been removed from office for financial mismanagement. The court stated that private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity may involve matters of public interest. (*Du Charme, supra*, at p. 115.) The court found, however, that the facts before it involved conduct that was "not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community)." (*Id.* at p. 119.) The court held that in the latter case, in order to satisfy the public issue or issue of public interest requirement of section 425.16, subdivision (e)(3) and (4), "the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging participation in matters of public significance." (*Ibid.*, italics omitted.) The court found Local 45's statements about the plaintiff's discharge unconnected to any discussion or debate because the plaintiff's termination was a fait accompli and members of Local 45 were not being urged to take any action on the matter. (*Ibid.*)

■ In *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 [130 Cal.Rptr.2d 81] (*Rivero*) the plaintiff supervised eight janitors at the International House on the University of California at Berkeley campus. The plaintiff sued the union for distributing documents describing accusations that the plaintiff solicited bribes, harassed those under his supervision, and favored certain employees. (*Rivero, supra*, 105 Cal.App.4th at pp. 916–917.) The union argued that its statements concerning the plaintiff involved a public issue or an issue of

public interest because the " 'abusive supervision of employees throughout the University of California system is an issue of particular public interest because it impacts a community of public employees numbering 17,000.' " (*Id.* at pp. 917, 919.) After reviewing published decisions interpreting the terms "public issue" and "public interest" in section 425.16, subdivision (e), the court noted that each of those cases concerned a person or entity in the public eye, conduct that could directly affect a large number of people beyond the direct participants, or a topic of widespread, public interest. (105 Cal.App.4th at p. 924.) In *Rivero*, the plaintiff and his supervision of eight custodians had not received public attention or media coverage, and the only individuals directly involved in and affected were the plaintiff and the eight custodians he supervised. (*Ibid.*) The court held that the plaintiff's supervision of eight custodians at the International House was hardly a matter of public interest. (*Ibid.*) In so holding, the court rejected the contention that all unlawful workplace activity or "labor disputes" automatically rise to the level of an issue of public interest. (*Id.* at pp. 924, 929.) The court further stated that the fact that a union published the challenged statement did not turn an otherwise private matter into one of public interest. (*Id.* at p. 926.)

This case is analogous to *Rivero*. Here, as in *Rivero,* a small number of workers was involved in the strike. No evidence shows that the Union's statements about Price, contained in the flyers, were made in connection with a public figure, a topic of widespread community interest or prior media coverage, or even a topic of interest to a substantial number of people. Further, Price was not involved in the strike negotiations; the Union distributed the flyers at his home, in a different city from the jobsite; the flyers were for the most part personal and not strike related; and the target (even captive) audience members were neighbors who had neither knowledge of, nor interest in, the strike. The fact that the flyers' distribution took place during a labor dispute and was undertaken by members of organized labor did not cause the action to rise to the level of a matter of public interest.

The Union cannot even establish a remote connection between the flyer first distributed on November 11, 2009, and the labor dispute between the Union and Road Machinery. (*Weinberg, supra,* 110 Cal.App.4th at p. 1132.) There is no evidence that the first flyer even *references* the Union, Road Machinery, or any labor dispute. The Union's argument that "[e]very handbill was prefaced by an acknowledgment of the ongoing labor dispute, and contained statements that are common place in such labor disputes," is both made without citation to the record and without support in the record.[8] The

---

[8] See *In re S.C.* (2006) 138 Cal.App.4th 396, 406 [41 Cal.Rptr.3d 453] ("When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made.").

fact that the statements in the flyer were prepared and distributed by the Union does not turn the Union's personal attack on Price into a public issue or an issue of public interest. (*Rivero, supra*, 105 Cal.App.4th at p. 926.)

As for the flyer distributed by the Union in late November, there is some evidence that the flyer did reference "workers" and a "strike." The Union argues that this second flyer "concerned the larger [u]nion," informed the public of Price's position with Road Machinery, and was calculated to exert pressure on Price, who was directly involved in the ongoing labor dispute. Again, the Union fails to cite the record in support of these assertions, nor does our review of the record offer any of the Union's assertions any support.

The evidence does show, however, that Price was not part of Road Machinery's collective bargaining committee, and he played no role in and had no ability to affect Road Machinery's negotiations with the Union. There is no evidence that the Union's distribution of flyers at Cobble Oaks was part of a larger union effort.

Nor does it appear that the Union's statements about Price concerned a topic of ongoing discussion within the West Sacramento or Rancho Cordova community or among Price's neighbors. Further, there is no evidence that the labor dispute between Road Machinery and the Union was of any interest to those communities. As the trial court found, there was no demonstrated connection between Road Machinery's West Sacramento facility and Rancho Cordova's Cobble Oaks residents. We also cannot conclude, based on the record, that the Union distributed the flyers at issue to engage Cobble Oaks residents or visitors in any discussion that was of public interest.

▉ Citing cases interpreting the National Labor Relations Act (29 U.S.C. § 151 et seq.) and the United States and California Constitutions, the Union argues that its distribution of flyers, or "handbilling," at Cobble Oaks is entitled to constitutional protection. But not all "handbilling" is protected under section 425.16—only that which meets the additional requirements described above. ▉ As previously explained, due to the flyers' target (Price, who was not involved in negotiations) and content (personal attacks), as well as the location of the activity (Cobble Oaks) and the target audience (neighbors who were not coworkers or even aware of Price's profession nor involved in any related ongoing dispute or discussion), the Union has not shown that the flyers concern a "public issue" or an "issue of public interest," and thus did not meet its initial burden under section 425.16. Therefore we need not consider whether Price demonstrated the viability of his defamation and false light claims against the Union. (*Rivero, supra*, 105 Cal.App.4th at pp. 929–930.)

## DISPOSITION

The judgment is affirmed. Price shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Raye, P. J., and Robie, J., concurred.